IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Betty Jo Leopard, ) | Civil Action No. 6:10-2562-CMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on January 27, 2006, alleging that she became unable to work on September 23, 2005. The applications were denied initially and on reconsideration by the Social Security Administration. On June 28, 2006, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Karl Weldon, an impartial vocational expert, appeared on November 4, 2008, considered

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

the case *de novo*, and on January 12, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on August 9, 2010.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.
>
> 2.  The claimant has not engaged in substantial gainful activity since September 23, 2005, the alleged onset date (20 C.F.R. §§ 404.1571, and 416.971 *et seq.*)
>
> 3.  The claimant has the following severe impairments:  HIV, diabetes, affective disorder, and vision loss (20 C.F.R. §§ 404.1521, *et seq.* and 416.921 *et seq.*).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526, 416.925, and 416.926).
>
> 5.  After careful consideration of the entire record, I find  that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c).  I specifically find that the claimant can lift fifty pounds occasionally and twenty-five pounds frequently; that the claimant can frequently work with small objects; and that the claimant is limited to simple, routine and repetitive tasks.
>
> 6. The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

2

7.  The claimant was born September 1, 1949, and was 56 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

8.  The claimant has at least a marginal education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569a, 416.969 and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 23, 2005 through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

4

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff has received treatment for diabetes mellitus since 1986 and treatment for anxiety since at least July 2000 (*see, e.g.,* Tr. 483-84, 200-03, 267, 340-42).

In August 2005, Kristen Kupeyan, M.D., assessed the plaintiff with depression and started her on antidepressant medication (Tr. 346-49; *see also* Tr. 350-52).

In September 2005, the plaintiff returned to Dr. Kupeyan and reported that she had not eaten in four weeks, stating that she felt hungry but became too full after a couple bites. She sat in a wheelchair and had visible weight loss and muscle atrophy (Tr. 311-15).

5

The plaintiff was subsequently diagnosed with human immunodeficiency virus ("HIV") (Tr. 371). Later that month, the plaintiff reported that her strength had returned to the point where she could walk on her own, do dishes, and prepare her own meals. She said she felt less depressed and declined to continue antidepressant medication. Dr. Kupeyan noted that the plaintiff's diabetes was controlled with treatment (Tr. 359-62).

In October 2005, the plaintiff told Dr. Kupeyan that she was having trouble dealing with the HIV diagnosis. She reported depression but denied thoughts of suicide and again declined antidepressant medication. The plaintiff also reported that she had stopped taking her insulin "because she has not needed it anymore." Dr. Kupeyan encouraged her to take her medication as prescribed (Tr. 363-67). The doctor provided the plaintiff with a letter stating that "[a]t this time she is unable to perform her routine work duties due to extreme fatigue." Dr. Kupeyan did not state how long these limitations would last or opine about the plaintiff's ability to perform work other than farm labor (Tr. 466).

Also in October 2005, the plaintiff began to receive treatment at the Spartanburg Regional Healthcare System ID Clinic ("ID Clinic"). She said that she was "currently doing farm work only to her level of tolerance." A care provider started her on antidepressant medication. The plaintiff reported blurred vision (Tr. 433). A care provider subsequently observed that, while the plaintiff did not have any HIV-related eye problems, there were some diabetes-related changes in her eyes. The plaintiff was assessed with diabetic retinopathy, diffuse clinically significant macular degeneration, epiretinal membrane (a membrane that can develop on the surface of the macular area of the retina), and incipient cataract (an incomplete cataract) (Tr. 373).

In December 2005, the plaintiff returned to the ID Clinic and reported fatigue and difficulty eating. Her care provider adjusted her HIV and diabetes medication and started her on medication to treat loss of appetite (Megace) (Tr. 430). Later that month, the plaintiff reported generalized weakness but said that her depression was "much improved."

6

She had not yet started taking her antidepressant medication.  The plaintiff also said that she was not checking her blood sugar levels.  Her care provider noted that she was gaining weight (Tr. 423, 428).

In February 2006, the plaintiff stated that, during a typical day, she went to the bathroom, walked to the kitchen to take her medication, sat on the couch and watched television, waited for the mailman, and then watched television until bedtime. She prepared at least simple meals, cleaned for 30 minutes at a time, did laundry once every two weeks, walked next door to her sister's house, and went to the store with her sister or son.  The plaintiff said she no longer drove due to vision problems.  She got around by walking or getting rides from others (Tr. 121-28).  Also that month, the plaintiff's care provider at ID Clinic noted that the plaintiff had forgotten her blood sugar log.  Her hemoglobin A1c levels were 6.6.[2]  The plaintiff said that she got very tense when all four of her grandchildren were with her (Tr. 419-20).

In March 2006, the plaintiff's care provider at the ID Clinic observed that the plaintiff's HIV was responding well to medication (Tr. 418).  The plaintiff stated that she had not experienced any changes in her vision since November 2005; her care provider noted that there were no HIV-related changes in her eyes and only "[a] little bit of" diabetes-related change, "but no treatment at this point" (Tr. 489).  Dr. Kupeyan opined that the plaintiff was depressed but had "adequate" attention, concentration, and memory; "appropriate" thought content; and "intact" thought processes (Tr. 405).

In April 2006, the plaintiff reported continuing fatigue, but said she was doing "ok."  She stated that she was currently not working, but also said that she was "left to look after" her grandchildren on weekends (Tr. 414).

---

[2]  Hemoglobin A1c is a test that measures the amount of glycated hemoglobin in a person's blood.  Individuals with diabetes are encouraged to keep their A1c levels at or below 7%. *See* HbA1c, available at http://www.nlm.nih.gov/medlineplus/ency/article/003640.htm.

In May 2006, the plaintiff reported numbness in her feet and fingers (Tr. 413). Laboratory tests showed that her CD4 cell count was 157 per cubic milliliter (mm3) of blood (Tr. 500).[3]

In June 2006, the plaintiff reported weakness in her legs, lack of energy, and anhedonia (loss of interest or pleasure in daily activities) (Tr. 516). The following month, she reported fatigue and weakness in her legs (Tr. 514). In August 2006, the plaintiff reported days when she was unable to do much activity. However, she was able to relate her medication doses without difficulty (Tr. 513).

In October 2006, a care provider noted that the plaintiff had a diabetes-related hemorrhage in her left eye, which required treatment. However, her right eye was stable and did not require treatment at that time (Tr. 487). The plaintiff underwent pan-retinal photocoagulation ("PRP)" treatment on her left eye the following month (Tr. 485). She reported bright spots in her left eye following the PRP treatment. However, a care provider noted that her left eye was doing well and that her right eye appeared stable (Tr. 491, 542). During this time period, the plaintiff's CD4 cell count was 153/mm3 (Tr. 499).

In late 2006, the plaintiff reported psychotic symptoms, including auditory and visual hallucinations (Tr. 491, 509-10, 529). On December 20, 2006, during a psychiatric admission physical by Robert McDonald, M.D., the plaintiff exhibited a depressed affect but was well-developed and well-nourished, with normal full range of motion of all joints and intact sensation, reflexes, coordination, muscle strength, and muscle tone. The plaintiff presented to the emergency room reporting hallucinations and suicidal ideation. She reported seeing animals and people, and hearing people call to her. Dr. McDonald's

---

[3] A CD4 cell is a type of infection-fighting white blood cell. CD4 cell count tests measure the strength of a person's immune system. A normal CD4 cell count is more than 500 cells per mm3 of blood. A person with a CD4 count of fewer than 200/mm3 is one of the qualifications for a diagnosis of AIDS. See Types of Lab Tests, http://aids.gov/hiv-aids-basics/diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/#numbers (last visited December 22, 2011).

assessment included HIV, anxiety/depression, and psychosis. He noted that the plaintiff was being admitted for psychiatric evaluation and referred her to another doctor for treatment (Tr. 529-34). The plaintiff appears to have undergone inpatient psychiatric care at Spartanburg Regional Medical Center during 2007 (Tr. 587).

In January 2007, the plaintiff presented to the emergency room and reported nausea and exhaustion. She said her symptoms were similar to those from a past anxiety attack. Emergency room staff assessed her with depression (Tr. 522-23). The next day, the plaintiff reported that she was depressed but otherwise felt "fine." Her CD4 levels had increased to 197/mm3; her HIV was noted to be "stable" (Tr. 499, 527-28). Later that month, the plaintiff said that she did not feel well, reporting weakness, vomiting, and edema in her right foot. Her care provider at the ID Clinic did not observe any edema (Tr. 508).

In February 2007, the plaintiff reported that she did not feel well and that she did not have the energy to take care of her grandchildren. A care provider adjusted her HIV medication and recommended counseling and psychiatric care (Tr. 507). Later that month, a care provider advised the plaintiff that medication could cause disturbances in psychological states and started her on antipsychotic medication (Tr. 505-06). The plaintiff subsequently reported that she felt better and was observed to have a better affect (Tr. 504). Laboratory tests showed that her CD4 levels had increased to 217/mm3 (Tr. 499).

In March 2007, a care provider observed that both of the plaintiff's eyes were stable (Tr. 541).

In May 2007, the plaintiff presented to Robert Whitmore, M.D., for evaluation. She said that she did not check her blood sugar levels at home but did exercise. On examination, the plaintiff was alert and cooperative, with a normal mood and affect, normal attention span and concentration, normal neurological examination, and full range of motion in all joints (Tr. 563-68). Her diabetes was observed to be under good control, with recent

hemoglobin A1C levels of 6.2 (Tr. 556).   The plaintiff had similar physical examination results in June and July 2007 (Tr. 551-59).

In August 2007, the plaintiff presented to the emergency room and reported a "panic attack" (Tr. 518-20).   During this time period, she was assessed with increasing macular edema in her left eye (Tr. 540).   She underwent a procedure on her left eye in September 2007 and was subsequently observed to be healing well (Tr. 535-39).

In November and December 2007, the plaintiff was again observed to be alert and cooperative, with a normal mood and affect, normal attention span and concentration, normal neurological examination, and full range of motion in all joints (Tr. 543-50).

In February 2008, the plaintiff reported vomiting and general malaise.   She also reported increased depression after running out of antidepressant medication. However, the plaintiff denied fatigue, anxiety, or psychotic symptoms.   Her care provider refilled her antidepressant medication (Tr. 569-74).

In April 2008, the plaintiff denied fatigue, anxiety, and depression.   She said she was checking home blood sugars and exercising.   The plaintiff was observed to be alert and cooperative, with a normal mood and affect, normal attention span and concentration, and full range of motion in all joints.   A diabetic foot exam was within normal limits.   Dr. McDonald found that, based on the plaintiff's report, her diabetes was not well-controlled. He adjusted her diabetes medication (Tr. 580-84).   Later that month, Dr. Whitmore noted that the plaintiff's home blood sugar results were elevated and requested hemoglobin A1C tests to confirm this.   Again, the plaintiff was observed to be alert and cooperative, with a normal mood and affect, normal attention span and concentration, normal neurological examination, and full range of motion in all joints (Tr. 575-79).

In June 2008, Dr. Whitmore stated that the plaintiff's CD4 tests and viral loads[4] had been "very good recently."  However, he opined that her impairments would preclude her from performing light work on a full-time basis due to disruption from mental impairments (including depression), fatigue, and malaise.  Dr. Whitmore opined that the plaintiff would need frequent breaks ("significantly more than one hour per day") and would miss more than three days of work per month.  He further opined that she was unable to perform even simple tasks in a production-oriented work environment, due to frequent crying spells and panic attacks (Tr. 593).

In July 2008, the plaintiff presented (upon referral by her attorney) to James Ruffing, Psy.D., for a psychological evaluation.  She told Dr. Ruffing that she was unable to work because she was chronically tired.  She also said that she felt "some depressed."  The plaintiff lived with a friend.  During a typical day, she watched television and did some housecleaning.  The plaintiff handled her own personal care, prepared at least simple meals, and did laundry.  She was able to shop by herself, although she said that her niece typically shopped for her. The plaintiff wore corrective lenses.  She was able to accurately and independently complete an intake questionnaire and remained calm throughout the examination.  On examination, the plaintiff was alert, oriented, involved, and responsive, with varying levels of attention and concentration but an appropriate affect (within the "normal range"); intact memory; normal rhythm, rate, and flow of speech; intact, relevant, and coherent thoughts; and no evidence of psychosis. Dr. Ruffing stated, "during periods of heightened emotional distress, [the plaintiff] is likely to experience increased difficulty

---

[4] Viral load is a measure of the severity of a viral infection in the human body, by measuring the total body burden of viral particles present in human blood. *Taber's Cyclopedic Medical Dictionary*, 2322 (Donald Venes *et al.* eds., 20th ed. 2005, F.A. Davis Co.).  Usually, the greater the number, the sicker the patient. *Id*.  The HIV viral load increases with advancing immunosuppression. *The Merck Manual of Diagnosis and Therapy* 1314 (Mark H. Beers et al. eds., 17th ed. 1999, Merck Research Labs.).  Also, high levels of the HIV viral load predict future declines in CD4 molecule counts, which generally results in a suppression of the functioning of the immune system. *Id*.

with focusing and attending fully on a consistent and extended basis." He also indicated that the plaintiff demonstrated some slowing of her speed of cognitive processing (Tr. 585-92).

Dr. Ruffing administered the Minnesota Multiphastic Personality Inventory-2 ("MMPI-2"), finding the plaintiff's responses indicated features of somatic discomfort, depression, and pain. Dr. Ruffing noted that individuals with this profile might have "a tendency to exaggerate the severity of the physical illness" or "overreact to minor physical discomfort." The testing did not reflect an attempt by the plaintiff to either minimize or exaggerate her psychological problems. He assessed the plaintiff with dysthymic disorder and affective disorder and completed a form entitled "Medical Assessment of Ability to Sustain Work-Related Activities (Mental)," opining that she could maintain attention and concentration and behave in an "emotionally stable" manner for 50% of an 8-hour day; and could follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; deal with ordinary work stressors; function independently; understand, carry out, and remember simple, detailed, and complex instructions; maintain her personal appearance; and demonstrate reliability for 60% of an 8-hour day. Dr. Ruffing also opined that the plaintiff was capable of managing benefits in her own best interest (Tr. 585-92).

During the administrative proceedings, State agency psychologists Lisa Varner and Rob Ronin reviewed the record and opined that the plaintiff did not have severe mental impairments (Tr. 391-404, 435-48). State agency doctors George Chandler and Dale Van Slooten reviewed the record and opined that the plaintiff's abilities were consistent with the ability to perform a range of medium work (Tr. 383-90, 449-56).

The plaintiff was represented by counsel during the administrative hearing (Tr. 23). She said she last worked in 2005 as a farm worker (Tr. 29). She said she stopped working because she was "too weak" and had not tried to find work since that time (Tr. 30). The plaintiff said she experienced vomiting as a possible side effect of her HIV medication

12

(Tr. 31).  However, she acknowledged that, with treatment, she had gotten "[a] lot" stronger (Tr. 42).  The plaintiff also reported depression for which she attended therapy and took medication (Tr. 31).  She said her antidepressant medication made her feel calmer (Tr. 32). The plaintiff said her diabetes was not currently controlled (Tr. 33).  She reported reduced vision in her left eye (Tr. 34).   The plaintiff said she sometimes experienced visual hallucinations, seeing people, animals, and insects that were not actually there (Tr. 40-41).

With regard to her functional abilities, the plaintiff reported limitations in standing and walking, but said she did not experience any difficulty sitting (Tr. 35-36). When asked whether she could lift 50 pounds, she stated that she did not know (Tr. 36-37).

The plaintiff initially testified that she lived with a friend (Tr. 27), but later asserted that she did not have any friends and that the individual she lived with was simply a roommate (Tr. 37).  She had a driver's license, but said she did not drive due to vision limitations (Tr. 39).  The plaintiff prepared at least simple meals, shopped, washed dishes, did laundry, made her bed, did some vacuuming (but not "a lot"), and put the garbage out on her back porch (Tr. 39-40).

Vocational expert Carl Weldon testified that the plaintiff's past work as a fruit farmer was semiskilled and medium[5] in exertional level (Tr. 45).   The ALJ asked the vocational expert to consider a hypothetical individual of the plaintiff's age, education, and work experience who could perform a range of medium work so long as she only frequently looked at small objects and was limited to simple, routine, and repetitive tasks (Tr. 45-46). The expert testified that the hypothetical individual could not perform the plaintiff's past relevant work, but could perform other work which exists in significant numbers in the national economy, including the unskilled medium jobs of general warehouse worker

---

[5]  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. See 20 C.F.R. § 404.1567(c).

(*Dictionary of Occupational Titles* (DOT)[6] 922.687-058, 3,000 jobs in upstate South Carolina and 1.2 million jobs nationally) and general office cleaner (DOT 381.687-018, 1,700 jobs in upstate South Carolina and 413,000 jobs nationally) (Tr. 47-48).

The plaintiff's counsel posed a question to the vocational expert that was purportedly based on Dr. Ruffing's July 2008 opinion, asking whether an individual who could behave in an "emotionally stable manner" about 50 percent of the workday and "demonstrate reliability" about 50 percent of the workday[7] could perform the jobs of general warehouse worker or general office cleaner (Tr. 50). The expert testified that an individual with the limitations described by the plaintiff's counsel could not work (Tr. 50).

After the ALJ issued his January 12, 2009 decision, the plaintiff submitted additional evidence to the Appeals Council, including records from Orin Community Health Center and the Center for Family Medicine (Tr. 594-664)[8]. In March 2009, records from the Orin Community Health Clinic indicated she was "still" having nightmares about dead people (R. 603). Three months later she was still not sleeping at night and records indicated that she needed individual therapy "asap" (Tr. 600). A month later, records stated that the plaintiff had chronic major depressive disorder, severe, with psychotic features, and that she continued to be very depressed (Tr. 599). She was also experiencing crying spells, poor appetite, and decreased concentration and energy (Tr. 599). When the plaintiff returned to the clinic a couple weeks later she had only slight improvement in mood, which was noted to still be sad (Tr. 598).

The Appeals Council found that the additional information did not provide a basis for changing the ALJ's decision (Tr. 1-5).

---

[6] U.S. Department of Labor, *Dictionary of Occupational Titles* (4th ed., rev. 1991).

[7] Dr. Ruffing actually opined that the plaintiff could demonstrate reliability for at least 60—not 50—percent of the workday (*compare* Tr. 50 *with* Tr. 592).

[8] The plaintiff does not rely on this evidence in her argument.

## ANALYSIS

The plaintiff alleges disability commencing September 23, 2005.  She has a marginal education and past relevant work as a farm worker.  The ALJ found that the plaintiff's HIV infection, diabetes, affective disorder, and vision loss were severe impairments.  The ALJ further determined that the plaintiff could perform a reduced range of unskilled medium work and that work existed in significant numbers in the national economy that she could perform.  The plaintiff argues that the ALJ erred by failing to properly consider the opinions of consultative examiner Dr. Ruffing and treating physicians Drs. Kupeyan and Whitmore.  This court agrees.

The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:  (1)  the length of the treatment relationship and the frequency of the examinations; (2)  the nature and extent of the treatment relationship; (3)  the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5)  whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling 96-2p requires

that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

### Dr. Ruffing

Dr. Ruffing, a clinical psychologist, performed a psychological evaluation of the plaintiff in July 2008. As set forth above, he administered the MMPI-2, finding the plaintiff's responses indicated features of somatic discomfort, depression, and pain (Tr. 585-92).

> The ALJ stated as follows regarding Dr. Ruffing's report:

> Dr. Ruffing observed intact thought processes, no evidence of psychosis, inconsistent attention and concentration, and good cognitive faculties and memory. He noted her MMPI results to show somatic discomfort, depression, and pain and a "general hypochondrial picture." He diagnosed dysthymic disorder and adjustment disorder and noted psychological factors affecting medical condition[s].

(Tr. 16-17). The ALJ further stated, "I note that Dr. Ruffing found the claimant to exhibit hypochondrial symptoms . . . I . . . give some weight to the evaluation of Dr. Ruffing, who observed the claimant face-to-face" (Tr. 20).

As argued by the plaintiff, the ALJ did not address the significant findings by Dr. Ruffing from the administration of the MMPI-2. Dr. Ruffing found extensive limitations that would obviously affect work function, as he indicated that the plaintiff would not be able

16

to be productive for a high percentage of the work day in many ways (Tr. 591-92).   In the "Medical Assessment of Ability to Sustain Work-Related Activities (Mental)," he opined that the plaintiff could maintain attention and concentration and behave in an "emotionally stable" manner for 50% of an 8-hour day; and could follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; deal with ordinary work stressors; function independently; understand, carry out, and remember simple, detailed, and complex instructions; maintain her personal appearance; and demonstrate reliability for 60% of an 8-hour day (Tr. 591-92).   Although the ALJ stated that he gave the opinion "some weight," he did not set out these limitations in his decision and failed to give reasons for rejecting these findings.

The Commissioner argues that the ALJ "reasonably discounted" Dr. Ruffing's opinion to the extent that it was inconsistent with a finding that the plaintiff retained the ability to perform work involving simple, routine, repetitive tasks.  The Commissioner further notes that "other providers repeatedly observed that she was alert and cooperative, with a normal mood and affect and normal attention span and concentration" (def. brief at 17).  However, such arguments are *post-hoc* rationalization, where, as here, the ALJ did not address the findings in his decision.  *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

Furthermore, while Dr. Ruffing did note that persons with the plaintiff's "clinical profile code . . . often present themselves as physically ill and concerned about their physical functioning," he also noted that the MMPI-2's validity scales did "not indicate an attempt to respond to test items in a manner that would produce symptom exaggeration" (Tr. 588). Dr. Ruffing determined that the plaintiff's ability to attend, focus, and concentrate was inconsistent throughout the examination, "seemingly secondary to her emotional

distress level."  He opined that "during periods of heightened emotional distress, [the plaintiff] is likely to experience increased difficulty with focusing and attending fully on a consistent and extended basis" (Tr. 588).  Dr. Ruffing also stated that the plaintiff demonstrated some slowing to her speed of cognitive processing (Tr. 588).  Consequently, he made the findings described above.

During the administrative hearing, the plaintiff's counsel posed a question to the vocational expert that was purportedly based on Dr. Ruffing's July 2008 opinion, asking whether an individual who could behave in an "emotionally stable manner" about 50 percent of the workday and "demonstrate reliability" about 50 percent of the workday could perform the jobs of general warehouse worker or general office cleaner (Tr. 50).  The expert testified that an individual with the limitations described by the plaintiff's counsel could not work (Tr. 50).  While Dr. Ruffing actually opined that the plaintiff could demonstrate reliability for at least 60—not 50—percent of the workday (*compare* Tr. 50 *with* Tr. 592), it is clear nonetheless that such a limitation is an important consideration for the ALJ.  Accordingly, the ALJ should be instructed upon remand to consider Dr. Ruffing's opinion as to the plaintiff's limitations and to provide reasons for the weight given to such opinion.

### *Dr. Kupeyan*

The plaintiff next argues the ALJ erred in failing to evaluate or weigh the opinion of Dr. Kupeyan, who was the plaintiff's primary treating physician.  On October 13, 2005, Dr. Kupeyan provided the plaintiff with a letter stating that "[a]t this time she is unable to perform her routine work duties due to extreme fatigue" (Tr. 466).  The ALJ did not cite or discuss reasons for the acceptance or rejection of this opinion.  The Commissioner argues that Dr. Kupeyan did not state "how long these limitations would last," or "offer an opinion regarding [the plaintiff's] ability to perform work other than farm work" (def. brief at 13).  The Commissioner further argues that the ALJ's finding that the plaintiff could not perform her past relevant work was consistent with Dr. Kupeyan's opinion.  As argued by

the plaintiff, however, the ALJ did not provide these reasons as support for the weight he assigned to Dr. Kupeyan's opinion, because he failed to evaluate the opinion whatsoever. Accordingly, the Commissioner's arguments are *post-hoc* rationalizations. Furthermore, while the Commissioner is correct that a doctor's statement that a claimant is "unable to work" is vocational rather than medical in nature, and thus is never entitled to special significance, the ALJ must still properly evaluate such evidence. Accordingly, upon remand, the ALJ should be instructed to consider and evaluate Dr. Kupeyan's opinion and to provide reasons for the weight given to such opinion.

### Dr. Whitmore

Lastly, the plaintiff argues that the ALJ improperly gave little weight to the opinion of treating physician Dr. Whitmore. In June 2008, Dr. Whitmore opined as follows:

> I have treated Betty Leopard since approximately October 2005 primarily in relation to her infection with HIV. During that time, Ms. Leopard has consistently experienced and exhibited general malaise and fatigue, feelings which I think are exacerbated by her severe mental health issues, which include Major Depression. Although her viral loads and CD4 tests have been very good recently, I think that the combination of the impairments that I have described would prevent her from being to perform even light work under the attached definition. She could perform some of the activities listed sporadically, but not on an 8 hour per day, 40 hour per week basis. While her main issue with doing so would probably be disruption from her mental impairments, her fatigue and malaise which are exacerbated by her Depression would also make it so she would probably need to take breaks to rest frequently, significantly more than one hour per day, with light work under the attached definition. Also, I am sure that her mental health issues, in combination with her malaise and fatigue from HIV, would prevent her from being to attend work consistently. I am certain she would miss significantly more than 3 days of work per month. The mental health issues that she experiences alone enough to complete even simple tasks in a production oriented work environment. In particular, I am referring to her frequent crying spells and panic attacks.

(Tr. 593).   The vocational expert testified at the hearing that if the plaintiff would miss more than three days of work per month, all work would be precluded (Tr. 50).

The ALJ found as follows with regard to Dr. Whitmore's opinion:

> I do not ascribe much weight to the opinions of Dr. Whitmore described in Exhibit 33F, because his opinions conflict with the substantial evidence as a whole and are inconsistent with even his own treatment records. On May 24, 2007, Dr. Whitmore observed the claimant to show a normal mood and affect. As for the panic attacks that he mentioned in 33F, there is no evidence of the claimant experiencing regular panic attacks. As for the weakness that he described, the claimant's viral loads were undetectable in the latest treatment records, and her HIV was noted to be under good control.

(Tr. 20).

As for the ALJ's general statement that Dr. Whitmore's opinion conflicted with substantial evidence, the ALJ must give good reasons outlining specific, relevant evidence that justifies discounting the opinion of this treating physician. *See* SSR 96-2p, 1996 WL 374188, at *5.   Furthermore, the plaintiff's general malaise and fatigue are documented numerous times in the treatment notes of Drs. Whitmore, Kupeyan, and Carney (Tr. 312, 346, 363, 414, 507, 508, 569, 570).   Also, the plaintiff's depression was documented throughout the record in the treatment notes of Drs. Kupeyan, Carney, McDonald, and Whitmore (Tr. 311, 312, 314, 323, 346, 347, 350, 351, 352, 363, 365, 413, 314, 420, 428, 430, 433, 507, 508, 509, 510, 514, 523, 529, 531, 534, 570, 572, 587).   Given this evidence, the ALJ's reference to Dr. Whitmore's treatment note from May 24, 2007, stating that the plaintiff showed a normal mood and affect cannot be characterized as substantial evidence upon which to reject his opinion.

The ALJ also stated that "there is no evidence  of the claimant experiencing regular panic attacks" (Tr. 20).   However, the record shows a number of incidences of "anxiety and stress reactions," panic attacks, and "weak episodes" associated with anxiety (Tr. 202, 203, 207, 267, 522).   Likewise, her anxiety problems were well documented (Tr.

314-15, 341, 351, 356-57, 366, 529, 531, 534, 572).  Here, the ALJ has not shown that the record is inconsistent with Dr. Whitmore's conclusions.

The ALJ also rejected Dr. Whitmore's conclusion that the plaintiff suffered from severe weakness because "the claimant's viral loads were undetectable in the latest treatment records, and her HIV was noted to be under good control" (Tr. 20).  In doing so, the ALJ offered a medical opinion he was not qualified to make by concluding that Dr. Whitmore could not be correct in linking the fatigue to the HIV infection in light of normal viral loads.  Notably, Dr. Whitmore acknowledged in the opinion that the plaintiff's viral loads had "been very good lately" (Tr. 593).   The ALJ's conclusion that Dr. Whitmore's opinion regarding the plaintiff's fatigue was inconsistent with her viral loads is a medical conclusion that is not supported by the record.

Accordingly, upon remand, the ALJ should be instructed to re-evaluate Dr. Whitmore's opinion and to provide reasons for the weight given to such opinion in accordance with the foregoing.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/Kevin F. McDonald
United States Magistrate Judge

December 27, 2011
Greenville, South Carolina

21